31 C.C.P.A.(Patents)

## In re FERRIS.

### Patent Appeal No. 4911.

Court of Customs and Patent Appeals.
April 27, 1944.

Pennie, Davis, Marvin & Edmonds, of New York City (C. M. Fisher, of Washington, D. C., and R. T. McLean, of New York City, of counsel), for appellant.

W. W. Cochran, of Washington, D. C. (R. F. Whitehead, of Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the examiner rejecting as unpatentable over prior art cited all the claims, numbered 1 to 8, inclusive, of appellant's application for patent relating to a method for "Separation of Potassium and Sodium Chlorides."

Claims 2, 3, and 4 are so drawn that they are dependent on claim 1, and claims 6, 7, and 8 are so drawn that they are dependent on claim 5 which differs in meaning from claim 1 only in that it contains a limitation relative to a reagent which ap-

pellant's brief concedes does not constitute a new concept.

In the oral argument before us counsel for appellant conceded that claim 1 is the test claim—that is, that unless claim 1 be allowable none of the others are. On the other hand, if it be allowable all the others are.

It is sufficient, therefore, to quote claim 1. It reads:

"1. The method of separating potassium chloride and sodium chloride from crude salt mixtures which comprises grinding the crude mixture to an extent sufficient to effect physical separation of part of the chlorides while leaving a large part of the salt mixture insufficiently ground while avoiding crushing of the chlorides to a pulverized condition and leaving a large proportion of particles of the salt mixture, subjecting the ground salt mixture to a relatively coarse screening operation and returning the oversize particles for regrinding, subjecting a pulp of the undersize screened particles in a saturated salt solution to flotation separation with a flotation agent to give a froth concentrate of one of the chlorides, subjecting the tails from the flotation operation to a screening treatment using a screen in the range of 30 to 60 mesh to separate particles of the other chloride from the insufficiently ground oversize material and returning the oversize material for further grinding, thus maintaining a circulating load of insufficiently ground material through the flotation operation and back to the grinding operation."

In his application appellant included a drawing which diagrammatically shows his process. The crude material is passed by a conveyor from a storage bin to a ball mill where it is first ground as described in claim 1. The grinding results in different sized particles which pass to a coarse mesh screen (the drawing describes it as an 8 mesh screen, but the claims do not mention any specific dimension of that particular screen). The smaller particles fall through the meshes and, after the introduction of the reagent mentioned in claim 5 (but not involved here), pass to and through a series of four flotation cells. The particles which are too large to pass through the screen are returned to the ball mill, reground, and passed again to the screen and such as are small enough are carried to and through the flotation cells referred to. A salt solution is apparently introduced from a brine storage receptacle while the particles are on the screen and the finer particles become saturated with it. In the process of separation by flotation in the cells a flotation agent is used which gives a froth concentrate of "one of the chlorides." Parts of this concentrate seemingly may be drawn from the successive cells or passed back to the first cell for any reflotation desired, but after passing through the fourth cell there remain particles referred to as "tails," which are passed through two other flotation cells in which a froth concentrate of "the other chloride" is developed. The tails remaining are carried to a second screen, described in claims 1 and 5 as "in the range of 30 to 60 mesh," where further separation takes place by screening, and the oversized particles of the tails are then returned to the ball mill for further grinding. Other features are shown as in the drawing whereby steps of the process, such as agitating, filtering, washing, etc., are carried out, but since those steps are not involved in the claims they need not be described.

The examiner rejected the claims on references consisting of excerpts from a publication entitled "Denver Equipment Index" and two patents, viz.:

| Kirby | 2,088,325 | July 27, 1937 |
| Dehn (Br.) | 481,100 | Feb. 28, 1938 |

As indicated, the latter is a British patent which seemingly was procured by Dehn for the American Potash Company which uses the process at a plant in New Mexico. The Kirby reference was cited only in connection with the reagent limitation in claim 5 above alluded to, and in view of the concession of appellant it requires no consideration by us.

In his statement following the appeal to the board the examiner described the disclosure of the two references requiring our consideration as follows:

"The Denver Equipment Index shows a system of flotation on pages 104 and 105 and outlines the advantages thereof which involves the flotation of the mineral as soon as it is freed and before it has been ground finer. This process involves the use of flotation between the mill and the classifier to remove the separated material before being classified as to size. The book shows on the other pages cited the use of a screen on the end of the ball mill for removing material coarser than about 10 mesh from the feed to the flotation cell.

"The Dehn patent illustrates the flotation process used by the Potash Company of America in its plant at Carlsbad, New Mexico for separating potassium and sodium chloride [present in sylvanite ores]. In this process the salts are ground in a ball mill classified and the classified material separated by froth flotation and the tailings retreated in the circuit."

We think it proper to add to the above that the publication relates particularly to the treatment of gold bearing ores by a flotation process after grinding them, but references are also made to the treatment of a number of base metal sulphite ores.

We have obtained the impression from the respective decisions below that appellant there emphasized certain features which are not emphasized before us, and that certain matters emphasized before us were not emphasized there—at least, not until appellant filed with the board a petition for reconsideration of its original decision. Among the features originally emphasized below was that of recovering the potassium chloride element in the coarsest form in which it can be recovered by flotation and this is mentioned at different points in appellant's brief before us but, as we understand his position, this feature is not relied upon other than in connection with the maintenance of a circulating load of insufficiently ground material.

It will be observed that the concluding clause of claim 1 states as a part of appellant's process "maintaining a circulating load of insufficiently ground material through the flotation operation and back to the grinding operation." This evidently refers to such of the particles described as tails as are too large to pass through the 30 to 60 mesh screen and are returned to the ball mill for further grinding.

In appellant's brief before us it is said:

"The important feature of the invention, as we see it, is the carrying of this circulating load of insufficiently ground material through the whole operation, that is, through the grinder, the initial screen, the flotation cells and the final screening operation back to the grinder. It is this which makes possible the direct flotation recovery of the potassium chloride in coarsely divided form and which distinguishes the process from the previously used processes in which, for commercially feasible recoveries of potassium chloride, fine grinding and complicated temperature con-trol and selective dissolution at various stages, are required."

It appears to be appellant's contention that the feature so described is not defined in the prior art cited, after a discussion of which the brief asserts:

"We have previously shown that the process of the present application and that of the publication differ in the vital respect that the feature of a circulating load of insufficiently ground material through the entire flotation system is not present in the process of the publication. So far as a new result is concerned, the process of this application permits the potassium chloride to be recovered as a coarse material; the process of the publication, if applied to a mixture of potassium and sodium chlorides, would not."

The foregoing view was evidently brought to the attention of the examiner, even if not greatly emphasized before him, because we note that he pointed out that the publication "teaches the froth flotation of the mill discharge and the classification of the tailings of the flotation operation with return of the oversize to the mill."

The view also received the attention of the board in its original decision, and to an even greater extent in its decision on the petition for reconsideration where it said:

"After careful consideration of appellant's argument, we are not convinced that he has shown and claimed patentable matter over the references as discussed by us in our decision. We note that appellant does not now stress the differences in coarseness of grinding over the reference, the patent to Dehn. Dehn does not discuss particularly the character of the grinding as a first step. He does discuss the separation of finely ground material from coarsely ground material especially after the flotation treatment and the recirculation of the oversized material for another grinding operation. Appellant seems to stress the fact that by his coarse grinding part of the composite particles are left in the material during the further treatment. This may or may not be true of the Dehn process but certainly coarse material is left after the first treatments by Dehn to make it profitable to recirculate and regrind."

It may be said that the board in its original decision expressed the view that the showing in "the Dehn patent is especially

pertinent in that it describes the process for separating sylvanite ores consisting mainly of potassium sodium chloride crystals." The use of the publication as a reference, however, was also implicitly approved by the board.

The patent specification, like the application of appellant, embraces a drawing which diagrammatically illustrates the process. Numerous features are shown in the patent which are not shown by appellant and it is unnecessary to describe the patent in full detail. It is pertinent to state that it shows a hopper from which the crude material is conveyed to a grinding mill for crushing or grinding and a classifier to which the crushed material, saturated by a solution supplied from a tank, is conveyed "preferably by a pump" (appellant shows a pump in much the same relation), where the finer particles suitable for treatment by the flotation process are separated from the coarser particles. The coarser particles are returned to the grinding mill and the finer particles are carried to a first flotation cell where they form a pulp. The pulp, supplied with a reagent, is carried to and through other cells where froths are formed which result in developing concentrates, some composed mainly of potassium chloride and others mainly of sodium chloride. By further treatment of the respective concentrates in a manner unnecessary to describe here they are further separated and purified. It is clearly taught that substances produced in the flotation cells are carried to a dewaterer where the froth is to a very large extent separated from the solid particles, and that the latter are delivered to the hopper to be reground and again pass through the system.

It is true that the exact steps shown by appellant are not described in detail in the patent, and the phraseology of the respective specifications differs in several particulars. For example, the patent does not specify screens as separating mediums. The initial separating medium named in the patent is a "classifier," the precise nature of which is not described, and the first separation of the particles resulting from the treatment of the pulp appears to be accomplished by a "dewaterer." As we understand it, the tribunals of the Patent Office took the view that those instrumentalities are the equivalents of appellant's screens. However that may be, the use of a screen for the separation of coarse particles from fine particles in a flotation process is definitely shown by the "Denver Equipment Index" publication and both the patent and the publication teach the return of coarse particles to the grinding mill for further processing.

Appellant's arguments have received our respectful attention and careful consideration, but we are not convinced that his modifications of the prior art processes cited may be regarded as anything more than the exercise of skill by the trained worker in the art.

The decision of the board is affirmed.

Affirmed.